IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| Stephan Julian, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | Judge Dow |
| v. | ) ) | Magistrate Judge Valdez |
| Sgt. Franklin D. Paz, Maurice Anderson, and the City of Chicago, | ) ) ) ) | Case No. 14-cv-07163 |
| Defendants. | ) ) | |

**PLAINTIFF'S LOCAL RULE 56.1(A)(3)
STATEMENT OF UNDISPUTED MATERIAL FACTS**

Plaintiff, by counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1(a)(3), submits the following statement of undisputed material facts supporting his motion for partial summary judgment:

**Preliminary Facts**

1. Plaintiff Stephan Julian (hereinafter "Julian") is a forty (40) year-old male who, at all relevant times, lived in Chicago, within the Northern District of Illinois. [*Exhibit 1*, Deposition of Stephan Julian (hereinafter "Julian's Dep."), at 8:14-24, 9:1-12].

2. Defendant Sgt. Franklin D. Paz (hereinafter "Paz") is a police Sergeant employed by the City of Chicago. [*Exhibit 2*, Defendants' Answer and Affirmative Defenses to Plaintiff's First Amended Complaint (hereinafter "Defendants' Answer"), at ¶ 4].

3. Defendant Maurice Anderson (hereinafter "Anderson") is a police officer employed by the City of Chicago. [*Exhibit 3*, Defendant Anderson's Answer and Affirmative Defenses to Plaintiff's First Amended Complaint (hereinafter "Anderson's Answer"), at ¶ 5; *Exhibit 2*, Defendants' Answer, at ¶ 5].

4. Defendant City of Chicago is an Illinois municipal corporation. [*Exhibit 2*, Defendants' Answer, at ¶ 6].

5. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1343 and 1367. [*Exhibit 2*, Defendants' Answer, at ¶ 2; *Exhibit 3*, Anderson's Answer, at ¶ 2].

6. On October 25, 2013, Anderson arrested Julian at the direction of Paz. [*Exhibit 2*, Defendant's Answer, at ¶ 8; *Exhibit 3*, Anderson's Answer, at ¶ 8].

7. Paz "instructed Anderson to arrest [Julian] for obstructing an investigation." [*Exhibit 4*, Defendant Paz's Answers to Plaintiff's First Set of Interrogatories (hereinafter "Paz's Interrogatory Answers"), at ¶ 6; *Exhibit 5*, Deposition of Franklin D. Paz (hereinafter "Paz's Dep."), at 135:13-15].

8. Paz and Anderson were acting under the color of state law during the arrest. [*Exhibit 2*, Defendants' Answer, at ¶ 10; *Exhibit 3*, Anderson's Answer, at ¶ 10].

9. Paz and Anderson subsequently charged Julian with (or caused him to be charged with) Resisting or Obstructing a Police Officer. [*Exhibit 2*, Defendants' Answer, at ¶ 14; *Exhibit 3*, Anderson's Answer, at ¶ 14]. This charge was terminated in Julian's favor on November 21, 2013. [*Exhibit 21*, Certified Statement of Disposition and Report of Proceedings, JULIAN 011-014].

10. Anderson further charged Julian with (or caused him to be charged with) Obstructing Identification. [*Exhibit 3*, Anderson's Answer, at ¶ 16]. This charge was terminated in Julian's favor on November 21, 2013. [*Exhibit 21*, Certified Statement of Disposition and Report of Proceedings, JULIAN 011-014].

11. The Obstructing Identification charge was based on the alleged fact that Julian, "*after being taken into custody*, was asked, repeatedly, to provide his proper name, and, in doing so, offered multiple, false names in an attempt to conceal his identity." [*Exhibit 6*, Misdemeanor Complaint for

Obstructing Identification, JULIAN 002; *Exhibit 7*, Deposition of Maurice Anderson (hereinafter "Anderson's Dep."), at 52:4-16].

12. When asked "you said [Julian] obstructed identification on the scene, right?" Paz replied "No, no. He obstructed – *he obstructed the investigation* on the scene." [*Exhibit 5*, Paz's Dep., at 84:16-19].

13. Paz further stated that he "instructed [Anderson] to [arrest Julian] for obstructing an investigation, okay, and *eventually*, obstructing identification, *for him providing numerous names*." [*Exhibit 5*, Paz's Dep., at 135:13-17].

14. Anderson also signed a misdemeanor complaint against Julian for and Obstructing "Process of Service[1]" at the location of 7329 South Dorchester Avenue. [*Exhibit 8*, Misdemeanor Complaint for Obstructing Process of Service, COC 000020, JULIAN 001]. He was not subsequently charged with this crime by the State's Attorney. [*Exhibit 21*, Certified Statement of Disposition and Report of Proceedings, JULIAN 011-014].

15. This "might have been a typographical error by [Anderson], 'cause there's – the charge was obstructing an investigation… [Anderson] might have typed the wrong [statute/offense]." [*Exhibit 5*, Paz's Dep., at 133:8-10; 135:7-8]. Again, Paz actually "instructed [Anderson] to [arrest Julian] for obstructing an investigation." [*Exhibit 5*, Paz's Dep., at 135:13-17].

16. Or Paz believes that this complaint might fall "in the realm that the Department of Buildings was serving process" *i.e.* serving an order to vacate at 7329 South Dorchester Avenue. [*Exhibit 5*, Paz's Dep., at 133:18-22; 134:1].

17. Paz does not claim that Julian actually "interfered with the ability to serve [the order to vacate,]" as that order was being served on the house at 7329 South Dorchester Avenue by the

---

[1] Julian presumes the charge was intended to be for "Obstructing Service of Process" [720 ILCS 5/31-3].

3

Department of Buildings personnel (and not by the police). [*Exhibit 5*, Paz's Dep., at 134:2-12; 20-23].

## The Scene and Julian's Arrival

18. On October 25, 2013, Defendants Paz and Anderson were assigned the task of assisting the City of Chicago Department of Buildings in carrying out what Paz has referred to as a "blitz," which was partially organized by the Alderman of the Fifth Ward, Leslie Hairston. [*Exhibit 5*, Paz's Dep., at 19:12-20; 20: 5-9, 13-22; *Exhibit 7*, Anderson's Dep., at 13:9-13].

19. This "blitz" consisted of the Department of Buildings inspecting certain targeted properties on or near the 7300 block of South Dorchester Avenue and serving emergency vacate orders on certain houses deemed uninhabitable or unsafe, including the house at 7329 South Dorchester Avenue. [*Exhibit 5*, Paz's Dep., at 41:7-12, 16-18; 46:11-15; 19:12-16, 23-25; 20:1-4].

20. In carrying out this "blitz" operation, the Department of Buildings employed the assistance of various other City of Chicago agencies, which, when combined, consisted of twenty-to-thirty (20-30) or more City of Chicago employees. [*Exhibit 5*, Paz's Dep., at 19:17-19; 21:9-13; 22:8-10; 50:4-11].

21. Paz and Anderson were participating in the "blitz" with the understanding that they were there to provide assistance to the Department of Buildings, so that in the event that a situation arose in which the police were needed (like a senior citizen being uncomfortable talking to a non-police employee), they would be present to assist and ensure safety. [*Exhibit 5*, Paz's Dep., at 20:16-19; 41:16-19, 20-25; 42:1-7; 120:20-24; *Exhibit 7*, Anderson's Dep., at 36:12-16; 79:21-25]. Another police officer who was on the same team as Paz and Anderson, Demeka Burleigh, has verified that they were there to assist the Department of Buildings, "back them up," and "just kind of stand back in the wind," and maybe make an arrest if needed. [*Exhibit 9*, Deposition of Demeka Burleigh (hereinafter "Burleigh's Dep."), at 19:23-25; 19:12-13; 20:1-7; 22:1-3; 36;11].

4

22. On the date of the incident, Julian's friend/ex-girlfriend resided in the house at 7329 South Dorchester Avenue, which was one target home of the "blitz" operation. [*Exhibit 1*, Julian's Dep., at 59:1-7; *Exhibit 10*, Exhibit 6 to Anderson's Dep. – Photograph 1; *Exhibit 7*, Anderson's Dep., at 56:2-4; Plaintiff's Local Rule 56.1(a)(3) Statement of Undisputed Material Facts (hereinafter referred to as "PSOF"), at ¶ 19].

23. During the "blitz," Julian received a call from this ex-girlfriend who, screaming and freaking out, told him about the police forcing her to gather her possessions and leave her house so that they could board it up. [*Exhibit 1*, Julian's Dep., at 71: 13-21].

24. Julian drove there to find out what was going on. [*Exhibit 1*, Julian's Dep., at 73:9-24; 74:1].

25. Julian arrived at the scene of the "blitz," attempted to enter the gate leading to the front yard of the 7329 South Dorchester Avenue property, and was told by an unidentified police officer that he could not enter. [*Exhibit 1*, Julian's Dep. 79:1-10; *Exhibit 5*, Paz's Dep., at 77:10-14].

26. Julian turned around and remained on the public sidewalk. [*Exhibit 1*, Julian's Dep. 79:9-10].

27. While on the sidewalk, Julian called various City of Chicago entities using his cell phone to try to discover whether his ex-girlfriend's house was being shut down by the City of Chicago. [*Exhibit 1*, Julian's Dep., at 80:13-17].

28. Julian also asked multiple police officers who were walking by what was going, but they ignored him or made snide comments. [*Exhibit 1*, Julian's Dep., at 80:8-17].

**The Relevant South Dorchester Avenue Properties as of October 25, 2013**

29. South Dorchester Avenue ran north to south. [*Exhibits 10-15*, Exhibit 6 to Anderson's Dep. – Photograph 1, Exhibit 6 to Paz's Dep. – Photograph 2, Exhibit 7 to Paz's Dep. – Photograph 3, Exhibit 7 to Anderson's Dep. – Photograph 4, Exhibit 3 to Julian's Dep. –

Photograph 5, and Zoomed-in Photograph of 7331 South Dorchester – Photograph 6 (*Exhibits 10-15* are hereinafter referred to collectively as "Photographs of 7329 South Dorchester Avenue"); *Exhibit 1*, Julian's Dep., at 85:18-22].

30. The house at 7329 South Dorchester Avenue had a small front yard entirely enclosed by a metal fence. [*Exhibits 10-15*, Photographs of 7329 South Dorchester Avenue; *Exhibit 7*, Anderson's Dep., at 56:2-4; *Exhibit 1*, Julian's Dep., at 85:1-22; *Exhibit 9*, Burleigh's Dep., at 50:5-12].

31. There was a gate in the front fence at 7329 South Dorchester Avenue to enter and exit the front yard. [*Exhibits 10-15*, Photographs of 7329 South Dorchester Avenue; *Exhibit 1*, Julian's Dep., at 79:1-10; *Exhibit 9*, Burleigh's Dep., at 49:25; 50:1-4].

32. The house on the property immediately south of 7329 South Dorchester Avenue at 7331 South Dorchester Avenue was physically connected to the house at 7329 South Dorchester Avenue. [*Exhibits 10-15*, Photographs of 7329 South Dorchester Avenue; *Exhibit 7*, Anderson's Dep., at 75:18-25; 76:1-5; *Exhibit 1*, Julian's Dep., at 37:19-24].

33. The house at 7331 South Dorchester Avenue also had its own small front yard enclosed by a metal fence, with its own gate in its front fence for entrance and exit. [*Exhibits 10-15*, Photographs of 7329 South Dorchester Avenue; *Exhibit 1*, Julian's Dep., at 91:16-23; 92:1-5].

34. Both properties' front fences (which were part of a single north-south fence-line along with the other front fences on that side of Dorchester Avenue) bordered a public sidewalk that ran parallel to South Dorchester Avenue. [*Exhibits 10-15*, Photographs of 7329 South Dorchester Avenue; *Exhibit 5*, Paz's Dep., at 118:1-2].

35. As was commonly seen in Chicago, there was what Paz has referred to as a shared "gangway" running perpendicular to South Dorchester Avenue that provided a path to and from the side basement entrances and the backyards of the houses at 7329 and 7331 South Dorchester

6

Avenue. [*Exhibits 10-15*, Photographs of 7329 South Dorchester Avenue; *Exhibit 5*, Paz's Dep., at 116:5-5; *Exhibit 7*, Anderson's Dep., at 75:11-17; 76:6-18; *Exhibit 1*, Julian's Dep., at 92:19-22].

36. Although this shared "gangway" provided access to the side basement doors of both houses, the front part of the "gangway" was entirely located within the front yard of 7331 South Dorchester Avenue. [*Exhibits 10-15*, Photographs of 7329 South Dorchester Avenue.; *Exhibit 1*, Julian's Dep., at 92:3-5].

37. To get from the sidewalk directly into the front yard of 7329 South Dorchester, one was required to enter a gate in its front fence. [*Exhibits 10-15*, Photographs of 7329 South Dorchester Avenue; *Exhibit 1*, Julian's Dep., at 79:1-2; *Exhibit 9*, Burleigh's Dep., at 49:25; 50:1-12].

38. To get to the side basement entrance of the house at 7329 South Dorchester Avenue from the outside, one could enter 7331 South Dorchester Avenue through one of its front fence gates, which opened to its front yard, and then walk along the shared "gangway" heading east, towards the side basement doors of both of the houses and the back yards of the properties. [*Exhibits 10-15*, Photographs of 7329 South Dorchester Avenue; *Exhibit 1*, Julian's Dep., at 92:1-22; *Exhibit 9*, Burleigh's Dep., at 82:11-18].

**The Incident**

39. At some point thereafter, while Julian was standing on the public sidewalk, somewhere within three houses south of 7329 South Dorchester,[2] Paz ordered Anderson to arrest Julian for obstructing his investigation. [*Exhibit 5*, Paz's Dep., at 80:1-2; 82:14-17; 84:18-19; 113:13-19; 135:13-15].

40. Paz believed that his duty that day was to assist the Department of Buildings, and to help and ensure safety if a situation arose that required the police—so, Paz was essentially

---

[2] While Julian's exact location at this time is disputed by the parties, it is irrelevant for the purposes of Plaintiff's related motion for partial summary judgment; it is undisputed that he was not blocking the gate to the property or standing in the gangway that Defendant Paz claims he was using for ingress and egress.

"[s]tanding by," waiting for the Department of Buildings to bring something to his attention that he might need to assist with. [PSOF, at ¶¶ 18, 21; *Exhibit 5*, Paz's Dep., at 59:21-24].

41.    Sometime before Julian's arrest, Defendant Paz's role allegedly expanded to include assisting and/or supervising the City of Chicago's Department of Animal Control and Care and the Chicago Police Department's Auto-Theft Unit, which had each been called to perform various duties at 7329 South Dorchester Avenue. [*Exhibit 5*, Paz's Dep., 63:13-15; 64:8-18; 113:1-5; 134:10-12]. Burleigh claims that Paz, in relation to this expanded duty, was eventually walking with and talking to two other police officers who had been called to the scene, Officers Russell and Enahora, to tell them what needed to be done. [*Exhibit 9*, Burleigh's Dep., 89:5-14].

42.    Paz described this expanded role as assisting other departments or units and walking back and forth between the side basement entrance of the house at 7329 South Dorchester Avenue and various vehicles or persons located on Dorchester Avenue. [*Exhibit 5*, Paz's Dep., at 66:4-8; 74; 15-18; 113:8-11; 123:15-20].

43.    For such ingress and egress to/from the side basement entrance of the house at 7329 South Dorchester Avenue and the street, Sergeant Paz and the other City employees were using what Paz has referred to as a "gangway"—which is the small, previously-described path running perpendicular to the public sidewalk, in between the house at 7329 South Dorchester Avenue and the house adjoining it at 7331 South Dorchester Avenue, leading towards the basement entrances and backyards of the properties. [*Exhibit 5*, Paz's Dep., at 69:17-18; 74:6; 79:3-7; 113:8-11; 155:10-15].

44.    Julian believed Paz to be a City of Chicago housing inspector, not a police officer, because of his clothing—he was not wearing a uniform—and the fact that it appeared he was being "escorted" by a uniformed police officer. [*Exhibit 1*, Julian's Dep., at 94:8-16; 99:15-19; 106:22-24; 1-7:1-2; 131:18-24; 132:1-4; *Exhibit 5*, Paz's Dep., at 44:1-3].

45. "[Julian] was not inside of the yard" at any point during the incident. [*Exhibit 5*, Paz's Dep., at 118:9-11; *Exhibit 7*, Anderson's Dep., at 28:21-25; *Exhibit 9*, Burleigh's Dep., at 66:17-22; *Exhibit 16*, Deposition of Zebedee Danard (hereinafter "Danard's Dep."), at 20:2].

46. In fact, Julian never actually entered the yard located at 7329 South Dorchester Avenue or the yard at 7331 South Dorchester Avenue that day. [*Exhibit 5*, Paz's Dep., at 118:13-14].

47. Julian was not standing in the gangway during the incident. [*Exhibit 5*, Paz's Dep., at 155:18-19; *Exhibit 7*, Anderson's Dep., at 28:21-25; *Exhibit 16*, Danard's Dep., at 20:2].

48. Julian was not "blocking Paz from being able to move" during the incident. [*Exhibit 7*, Anderson's Dep., at 37:4-7; *Exhibit 9*, Burleigh's Dep., at 87:13-18].

49. Julian did not "physically make it so that Paz could not move left, right, forward, or backward." [*Exhibit 7*, Anderson's Dep, at 80:25; 81:1-3].

50. Paz was physically capable of walking around Julian immediately before he ordered that Julian be arrested. [*Exhibit 17*, Defendant Paz's Response to Plaintiff's Requests to Admit, at ¶ 3; *Exhibit 18*, Defendant Anderson's Response to Plaintiff's Request to Admit, at ¶ 18].

51. Nevertheless, Paz and Anderson do claim that Julian "was physically in Paz's way." [*Exhibit 7*, Anderson's Dep., at 77:12-16; *Exhibit 5*, Paz's Dep., at 113:21-25; 122:12-13].

52. It was not until Julian allegedly approached Paz and began talking that his presence bothered Paz or purportedly interfered with Paz's investigation. [*Exhibit 5*, Paz's Dep., at 112:15-23; 119:14-21; 120:14-20; 123:6-11; *Exhibit 9*, Burleigh's Dep., at 92:23-25].

53. Paz and Anderson contend that the entire incident lasted about five-to-six (5-6) minutes; Burleigh testified that entire operation went on from about 8:30 a.m. until after 2:00 p.m. [*Exhibit 7*, Anderson's Dep., at 30:12-14; 40:10-13; *Exhibit 5*, Paz's Dep., at 152:13-15; *Exhibit 9*, Burleigh's Dep., at 17: 1-6; 60:18-21].

54. Paz admits that, at most, his interaction with Julian lasted ten (10) minutes. [*Exhibit 17*, Defendant Paz's Response to Plaintiff's Requests to Admit, at ¶¶ 6-7].

55. Anderson admits that, at most, his interaction with Julian lasted six (6) minutes. [*Exhibit 18*, Defendant Anderson's Response to Plaintiff's Requests to Admit, at ¶¶ 24-25].

56. Julian was eventually handcuffed, detained, placed in a squad car, transported to the police station, and spent time in jail. [*Exhibit 5*, Paz's Dep., at 81:6-15; *Exhibit 1*, Julian's Dep., at 123:2-3].

57. The arrest report from the incident states:

In summary, the above is in custody, [*sic*] after he was observed loitering in an area where an investigation involving multiple, [*sic*] documented, [*sic*] gang houses, gang activity, as well as recent aggravated batteries and homicides have occur[r]ed, where, [*sic*] members of the 003 District Violence Suppression Team, uniformed police officers, members of the Auto Theft Unit, Troubled Buildings Unit, Department of Health, [and] Department of Buildings were present, conducting an investigation. The above approached the location where the investigation was being conducted, was asked to leave the area, refused, subsequently remained in direct proximity of the area being investigated, causing the investigatory process to be interrupted, and, [*sic*] was taken into custody, [*sic*] without incident after he refused to leave, [was] Mirandized, and, [*sic*] transported to the 003 District for processing. Repeated attempts to ascertain the proper name of the above were met by his resistance, [*sic*] until the above finally provided a correct name. A CLEAR photo of the above confirmed his identity.

[*Exhibit 19*, October 25, 2013, Arrest Report for Stephan A. Julian, at COC 000002].

58. Paz's explanation for arresting Julian is as follows:

So I remember -- I remember seeing him in this vicinity here, and then he was on the phone. After he got off the phone, he -- he approached me and identified himself as an attorney, initially. He said, "I'm an attorney," or something to that effect. He said that, you know, "I'm representing Carolyn Bridget." He didn't provide any credentials. He didn't provide any identification. I asked him -- you know, I told him we were conducting a -- you know, we were conducting an investigation at this particular location. I asked him to step away, and -- and move, and not obstruct my -- my path, and I asked him to step away multiple times. I asked him to leave because it did not concern him. And he demanded to know information on what we were doing there, who was involved, A, B, and C. So you know, after multiple times of asking him to step away and not be involved, I gave him multiple warnings. I then ordered Officer Anderson to place him under arrest for obstructing.

[*Exhibit 5*, Paz's Dep., at 79:9-25; 80:1-2].

59. Paz stated that Julian approached him when he "inched over" from his initial position as Paz was walking back and forth (using the gangway). [*Exhibit 5*, Paz's Dep., at 123:15-20].

60. Paz claims that Julian was one to two feet from him when he was arrested. [*Exhibit 5*, Paz's Dep., at 123:21-25].

61. Paz claims that he asked Julian to step away "four or five times, maybe," and then said it could have been six or seven times. [*Exhibit 5*, Paz's Dep., at 113:14-17; 153:14-22].

62. Paz claims that Julian was standing in the "general vicinity of the gate or the fence" to the yard at 7331 South Dorchester Avenue, on the sidewalk, west of the fence and south of that gate (not directly in front of it). [*Exhibit 20*, Exhibit 9 to Paz's Dep.; *Exhibit 5*, Paz's Dep., at 73; 19-25; 74:1-3; 155:6-9].

63. Paz admits that Julian was not required to provide identification prior to his arrest. [*Exhibit 5*, Paz's Dep., at 119:11-14].

64. Anderson believes that he arrested Julian for "obstructing or interfering with the investigation being conducted that day" because Julian "was ordered, repeatedly, in [his] presence, by [Paz] to leave the scene and he refused."[3] [*Exhibit 7*, Anderson's Dep., at 35:16-20; 36:1-4].

65. Officer Burleigh testified that during Julian's interactions with Paz, Paz was able to and did walk freely up and down the gangway multiple times, along with other employees, explaining to officers Enahora and Russell, who were processing the scene, what was taking place, and what had happened, while these officers took notes. [*Exhibit 9*, Burleigh's Dep., at 75:16-25; 76:1-11; 81: 5-25; 83:22-25; 84:1-7; 85:12-25; 86:1-17; 88: 9-16; 89:18-25; 90:1-8]. She said "they're back and

---

[3] Julian disputed this contention in his deposition, but this dispute is irrelevant for the purposes of Julian's related motion. Julian argues that asking questions of Paz about the operation and not leaving when ordered to do would not provide Paz with probable cause to arrest him.

11

forth… Paz goes back, doing—talking, doing whatever he needs to do to get this investigation going." After being asked how Julian was interfering with the investigation, she stated further:

> By continuing to, after being asked several times to leave, not leaving the scene, and by still interacting with Sergeant Paz and whoever else, yelling to what they can't do, so you're stopping them, especially the sergeant, from doing what he has to do because now he has to stop and take care of this problem, so it's still interfering with the investigation that's going on.

[*Exhibit 9*, Burleigh's Dep., at 121:10-19].

66. Paz was not carrying anything at this time. [*Exhibit 9*, Burleigh's Dep., at 90:19-20].

67. There were no car parts along the gangway, no dogs chained along the gangway, no guns present on the gangway, and there was nothing remarkable between the front of the house at 7329 and the house's basement stairs along the gangway. [*Exhibit 9*, Burleigh's Dep., at 100:2-22].

68. Prior to Julian's arrest Officer Burleigh did not see any people congregating in Julian's area as a result of his interactions with Paz. [*Exhibit 9*, Burleigh's Dep., at 128:9-17].

69. Officer Burleigh claims that Julian was obstructing because he was moving towards Paz, yelling, telling him what he could not do by law, and not leaving the area when ordered to do so numerous times by Paz (while Julian was outside of the gate and Paz was moving up and down the gangway). [*Exhibit 9*, Burleigh's Dep., at 93:8-25; 97:13-22].

70. During the "blitz," there were numerous other civilian "spectators" standing on public property on and around the 7300 Block of South Dorchester Avenue. [*Exhibit 5*, Paz's Dep., at 77:13-16; 84:8:14; *Exhibit 1*, Julian's Dep., 87:18-23; *Exhibit 9*, Burleigh's Dep., at 43:21-25].

71. During Julian's presence, at least one other civilian engaged in a conversation with police officers on the scene. [*Exhibit 1*, Julian's Dep., at 87:24; 88:1-7].

72. Other passersby asked questions of officers on the scene. [*Exhibit 1*, Julian's Dep., at 88:9-12].

12

73. Paz admits that he knows that it is "[a]bsolutely" not illegal to ask a police officer questions. [*Exhibit 5*, Paz's Dep., at 114:9-11].

74. Paz stated at his deposition:

I'm saying if -- if I was in a position, you know, and I was obstructing an officer from doing his job, and they told me to leave, me, the way I was born and raised, I would have said, "Yes, I'll leave."

[*Exhibit 5*, Paz's Dep., 154:5-8].

75. Officer Burleigh said at her deposition that Julian's actions got on her nerves. [*Exhibit 9*, Burleigh's Dep., at 86:11-13].

76. Paz, Anderson, and Burleigh have not testified that Julian was cursing, threatening anybody with words or gestures, engaging in disorderly conduct, continuing to try to gain access to the S. Dorchester properties, or that he physically touched an officer. [*See generally Exhibit* 5, Paz's Dep., *Exhibit* 7, Anderson's Dep., and *Exhibit* 9, Burleigh's Dep.]

                                            BY:    s/ Steven J. Molitor
                                                        *Attorney for Plaintiff*

Law Office of Julie O. Herrera
53 W. Jackson, Suite 1615
Chicago, IL 60604
Tel: 312-697-0022
Fax: 312-697-0812
smolitor@julieherreralaw.com

13